# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH AND SEIZURE OF DIGITAL ITEMS AND A GRAY NISSAN SENTRA; VIN # 3N1AB7AP9FY250499, MARYLAND LICENSE 2BZ4473. | Misc No. 18 - 0 1 4 9 JMC <br><br> 18 - 0 1 5 0 JMC |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jeffrey A. Yesensky, being duly sworn, do hereby depose and state:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and I have been so employed since November 2005[1]. I am currently assigned to a multi-agency child exploitation task force known as the Baltimore Maryland Child Exploitation Task Force ("MECTF"). Since September 2009, my responsibilities in the FBI have primarily involved the

---

[1] On May 8, 2014, in *United States v. Walter L. Williams* (C.D. Cal. 13-302-PSG), Special Agent Yesensky testified in a hearing regarding a border seizure and later warranted search of two laptop computers. In the search warrant affidavit, Special Agent Yesensky accounted for a delay in seeking the warrant due to an "oversight on my part due largely to demands of two forensic reviews that I was conducting concurrently of two computers in separate investigations, which each involved the review of hundreds of thousands of images."

While testifying before the district court, Special Agent Yesensky was asked to explain the "context" for the referenced portion of his search-warrant affidavit. Special Agent Yesensky testified that, during the seizure, he was also giving priority to other matters, such as leading a task force responsible for assisting 18-20 victims of child prostitution.

In a May 9, 2014 written opinion, the district court judge wrote that he "[did] not find this additional statement to be credible" and that the new statement "contradicts" his prior testimony. The judge wrote: "How could Agent Yesensky have 'overlooked' his duty to procure a warrant while simultaneously 'prioritizing' other matters?" In response to the district court's opinion, the United States Attorney's Office for the Central District of California and the Child Exploitation and Obscenity Section of the Criminal Division of the United States Department of Justice filed a Motion for Reconsideration urging the judge, for a variety of reasons, to revisit the district court's credibility finding as unsupported under the circumstances. The district court denied the Motion for Reconsideration on June 20, 2014.

On October 1, 2014, the Assistant Director in Charge (ADIC) of the FBI-Los Angeles Field Office (LAFO) memorialized LAFO's finding that the district court opinion did not warrant referral to the FBI's Office of Professional Responsibility for a lack of candor or any other investigative deficiency. In the executive summary of the non-referral statement, the ADIC wrote that, "The facts and circumstances of this case clearly indicate that SA Yesensky was not making any misrepresentation to the court. All prosecutors with intimate knowledge of the case disagree with the lack of credibility finding and supported the motion to reconsider that decision."

The district court's two Opinions, the Motion for Reconsideration (including the lead prosecutor's sworn Affidavit), the FBI's non-referral letter and executive summary, and the suppression hearing transcript are available to this Court upon request.

Since the issuance of the district court's opinion, Special Agent Yesensky has obtained more than ten Federal search warrants for electronic accounts and residences in multiple district courts.

1

USAO201300232          18 - 0 1 4 9 JMC          18 - 0 1 5 0 JMC

enforcement of federal criminal statutes involving the sexual exploitation of children pursuant to Title 18, United States Code, Section 2251, *et seq.* As part of my training, I have attended numerous training classes regarding the Internet, on-line child pornography, Internet child enticement, child sex trafficking, and child sex tourism, and have consulted with my colleagues who have many years of experience investigating child pornography and child exploitation cases. I have also been the affiant on numerous prior search and arrest warrants.

2.     This affidavit is made in support of an application for a search warrant to search the following digital items (hereinafter referred to as the "TARGET LOCATIONS"), which are described below with particularity in Attachment A-1 and A-2, attached hereto and incorporated herein by reference:

   A. ONE (1) SAMSUNG GLEAM CELL PHONE WITH S/N 270113177602754460 - (FBP #14);
   B. ONE (1) SAMSUNG INTENSITY II (SCH-4460) WITH S/N 0000023C3B505 - (FPD #21);
   C. ONE (1) SAMSUNG GALAXY S-4 CELL PHONE WITH S/N 990003451869826 AND ONE (1) 32 GB SANDISK MICRO SD CARD INSIDE - (FDP #3);
   D. ONE (1) HP PAVILION ENTERTAINMENT PC WITH S/N CNF84127GT AND CORD - (FPD #23);
   E. ONE (1) TOTAL TEC HP THUMB DRIVE - (FPD #15);
   F. ONE (1) ATTACHE THUMB DRIVE - (FPD #16);
   G. FIVE (5) CDR- DISKS - (FPD #13);
   H. ONE (1) CANNON SD MEMORY CARD SDC-32M WITH S/N BJ8GA183735 - (FPD #17);
   I. ONE (1) SANDISK SDHC MEMORY CARD 4 GB WITH S/N BH0826113475D (FPD #18);
   J. ONE (1) PNY MICRO SD CARD ADAPTER WITH 2GB SANDISK MICRO SD CARD S/N 0800602484U - FPD #20);
   K. ONE (1) D-LINK ROUTER WITH S/N PX5D1FC018985 - (FPD #11);
   L. ONE (1) WESTELL ROUTER WITH S/N 08FX07019288 - (FPD #12);
   M. ONE (1) ACTIONTEC ROUTER WITH S/N CREA5530101628 - (FPD #22);
   N. ONE (1) GRAY NISSAN SENTRA (VIN: 3N1AB7AP9FY250499) CONTAINING AN ELECTRONIC GPS NAVIGATION SYSTEM AND MARYLAND LICENSE 2BZ4473.

3. The items are to be searched for evidence of violations of Title 18, United States Code §§ 2251(a), (c), and (e) (production and attempted production of child pornography); 18 U.S.C. §§ 2252(a)(2) and (b)(1) (receipt and distribution of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (receipt and distribution of child pornography); 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of child pornography); and 18 U.S.C. § 2422(b) (coercion and enticement) ("THE SUBJECT OFFENSES").

4. The statements in this affidavit are based in part on documents and reports prepared by investigators of the Frederick Police Department ("FPD") and on my experience and background as a SA with the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of THE SUBJECT OFFENSES are located within the TARGET LOCATIONS.

## **BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL**

5. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

　　a. Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

　　b. Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a

3

digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such pictures have become sharper and crisper. Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

    c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

    d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

  e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

  f. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

  g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can

also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

        h.      An automobile navigation computer device uses the Global Positioning System ("GPS") to display its current location. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can store and contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna in an automobile receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

## PROBABLE CAUSE

      6.      On or about December 14, 2017, I was notified by Detective David Dewees from the FPD about an ongoing FPD investigation of a prior convicted child sex offender, RAMON MANUEL DELOSREYES ("DELOSREYES"), who was alleged to have sexually assaulted a 12-year old minor, ("D.C."), whom he met and communicated with on the internet. DELOSREYES was also alleged to have solicited and/or received sexually explicit images of this minor. Between approximately December 14, 2017, and December 20, 2017, I received copies of FPD investigative

reports, along with an affidavit in support of the search of DELOREYES's residence and vehicle. I reviewed these documents and learned the following:

7. On December 11, 2017, at 12:40 a.m., the FPD responded to D.C.'s residence in Frederick, Maryland, and took a report from D.C.'s guardian who told the FPD that D.C. had just informed her he was raped by an unknown male in Rockville, Maryland, which included this unknown male putting his penis in D.C.'s "butt." D.C. told the FPD responding officer he was okay and did not need a medic.

8. During the ensuing FPD investigation, D.C. was interviewed on multiple occasions by the FPD and a forensic interviewer. D.C. reported information in these interviews, which is summarized in part below:

   a. On December 10, 2017, D.C. met an adult male from Rockville, Maryland, who said he was 49-years old through a chat platform on the dating website PlanetRomeo.com ("Planet Romeo"). D.C. did not know this male's name, but he believed his name was "Nomar" and part of this male's username on Planet Romeo was "Nomar." (hereinafter referred to as "Nomar"). D.C. knew "Nomar's" residence to be in Rockville because "Nomar" had "Rockville" on his Planet Romeo profile and because D.C. saw signs for "Rockville" on the way to "Nomar's" house.

   b. D.C. described "Nomar" as mixed race and "Mexican/English"; as a white male who was possibly Hispanic; as being approximately 6'0" tall; as balding in front of his head; as having short dark brown hair with some gray; as wearing glasses; and as being overweight "but not fat."

  c. After D.C. met "Nomar" on Planet Romeo, the two had a sexual-based chat for approximately two hours before "Nomar" drove to D.C.'s residence and picked him up in his vehicle. D.C. reported the following took place during this online chat session:

  (i) In the report of an interview with D.C. on December 12, 2017, Detective Dewees reported that "Nomar" asked D.C. for pictures and D.C. sent several pictures of himself, to include images of his buttocks and erect penis[2]. In the pictures, D.C.'s face was visible. Detective Dewees observed those images were still on D.C.'s cellular phone;

  (ii) "Nomar" sent nude images of himself to D.C. through Planet Romeo;

  (iii) "Nomar" advised D.C. he wanted to meet with D.C., and D.C. provided his address. "Nomar" sent D.C. another chat through Planet Romeo when he arrived near D.C.'s house.

  d. At approximately 9:00 a.m. on December 10, 2017, after D.C.'s guardian went to sleep, D.C. snuck out of his residence, got into "Nomar's" car, and was driven by "Nomar" to his residence, which D.C. believed to be in Montgomery County, Maryland. D.C. recalled traveling down I-270 and driving through a "tunnel" on the way to the "Nomar's" residence.

  e. While at "Nomar's" residence, D.C. was very scared and he did what "Nomar" told him to do. "Nomar" had D.C. perform fellatio on him, and then "Nomar" performed anal intercourse on D.C. Then "Nomar" performed fellatio on D.C. Afterwards, "Nomar" again performed anal intercourse on D.C. and ejaculated on D.C.'s buttocks. After

---

[2] In two separate reports of an interview with D.C. on December 12, 2017, it was not clearly reported these pictures depicted D.C.'s erect penis. These reports, which were written by FPD Detective McPeak and Child Protective Services forensic interviewer Kristen Dunn, stated the suspect told D.C. to send him a picture of D.C.'s "butt" and he did. Additionally, these two reports state D.C. received 4 pictures of the suspect's genitals via the internet.

8

"Nomar" ejaculated, he wiped the seminal fluid using a rag or cloth of some type (unknown color).

  f. "Nomar's" vehicle was a black or dark colored four-door passenger car that contained a built-in GPS/Navigation device with a display located in the area of the radio, which "Nomar" used to assist in driving to and from D.C.'s residence.

  g. There was a gatehouse at "Nomar's" apartment community that was manned by a male. After they went by the gatehouse they pulled into a parking lot where he saw a snowman (Christmas decoration) that was in the yard of a residence close to "Nomar's" apartment building.

  h. Inside "Nomar's" apartment building, D.C. noted there were two sets of steps: steps that went down a level and steps that went up a level. "Nomar's" apartment was on the street level, to the far right, and next to a fire exit.

  i. D.C. drew a diagram for the FPD of the interior floor plan for "Nomar's" apartment. D.C. described that once he entered the apartment, there is a kitchen. The kitchen had two ways to enter. He stated after the kitchen was a living room area where there was a TV and furniture. As you go straight back from the doorway, there is a bathroom back the hallway. Next to the bathroom, there is a bedroom. D.C. advised that the apartment and the "Nomar's" car smelled of cigarettes.

  j. Inside "Nomar's" bedroom is a bed that has a crease in the center of the bed and runs horizontal to the bed. D.C. believed the color of the blanket on "Nomar's" bed may have been red. There is a computer that sits on top of a computer desk and a large "box" type TV in the bedroom.

k. D.C. described other items in the residence such as a shoe rack near the door, a religious statue near the kitchen, a "dresser" type piece of furniture near the front of the apartment, and Dallas Cowboys memorabilia throughout the apartment.

9. Detective Dewees located a Planet Romeo account identified as "Nomarloveyou," which displayed an apparent Hispanic male wearing glasses. Further review of this account by Detective Dewees showed the male fit the general description provided by D.C. The male is balding and has some dark brown hair with gray hair on the side. He is wearing glasses. In his bio, the male advised that he lives in "Rockville, MD."

10. Based on this information, Detective Dewees secured a screen shot of the account page, and on December 13, 2017, he displayed the image of the Planet Romeo account to D.C. D.C. immediately and without hesitation identified this as the "Nomar." D.C. further advised that the image of the male on the account is the same person who picked him up in Frederick and later sexually assaulted him at the apartment.

11. Detective Dewees located several face shots on the Planet Romeo site for "nomarloveyou" and utilized the Maryland Department of Public Safety & Corrections site to conduct a facial recognition search of these image. These images resolved to DELOSREYES, DOB: 08/28/1954, 3322 Chiswick Court, Apt. 2H, Silver Spring, MD 20906, who is a White, Male, 5'11" tall, and 190 lbs.

12. Detective Dewees obtained a criminal history report for DELOSREYES and determined DELOSREYES was convicted of 2nd degree sexual offense and Sexual Abuse of a Minor in Maryland in 2000. The victim of that incident was an elementary school aged child.

13. On January 4, 2018, I searched the Maryland Sex Offender Registry website and found DELOSREYES was listed as a Sex Offender Registrant related to a conviction in Montgomery County in 2000.

14. Detective Dewees traveled to DELOSEYES's residence at 3322 Chiswick Court, Apt. 2H, Silver Spring, Maryland to verify information provided by D.C. Detective Dewees observed the following:

   a. Detective Dewees traveled route I-270 and noted an underpass that closely resembles a small tunnel while traveling on the Intercounty Connector (MD 200) at Old Mill Run.

   b. DELOSREYES's address is located in a community called Leisure World. As Detective Dewees entered the community and noted a gatehouse as described earlier by D.C.;

   c. Detective Dewees pulled into the court where DELOSREYES's apartment is located and noted a snowman Christmas decoration that is to the rear of a residence, visible from the court;

   d. Detective Dewees went into the apartment building and noted DELOSREYES's apartment, 2H, was on the street level. Detective Dewees also observed four apartments that faced the front building door and DELOSREYES's apartment (Apt 2-H) was to the far right, near a fire exit, as described by D.C. Detective Dewees also noted a set of steps that led to the lower level floor and another set of steps that led to the upstairs level.

15. Detective Dewees made contact with Steve Wischmann, who is a property manager with Montgomery Mutual, which manages Leisure World. Wischmann provided Detective Dewees with a layout of DELOSREYES's apartment that is called the "Burgess 800 SQ/FT." Detective Dewees noted the floor plan is nearly identical to the drawing provided by D.C.

16. Detective Dewees observed a dark gray 2015 Nissan Sentra 4-door with Maryland license plate "2BZ4473", which is registered to DELOSREYES, parked in front of DELOSREYES's apartment building. The vehicle was similar to the description provided by D.C.

17. Based in part on the above information, on December 14, 2017, the Honorable Judge Mark Thomas of the District Court for Washington County, Maryland, signed a search warrant authorizing the search of DELOSREYES's residence (3322 Chiswick Court, Apt. 2H, Silver Spring, Maryland) and DELOSREYES's vehicle (2015 Nissan Sentra, VIN: 3N1AB7AP9FY250499).

18. On December 15, 2017, the above search warrant was executed by the FPD, the FBI, and the Montgomery County Police Department. Detective Dewees noted the following observations during the execution of this search warrant that were consistent with D.C.'s prior description of the residence:

   a. The kitchen with tile flooring fit D.C.'s description;

   b. Tan carpeting in living room, hallway and bedroom as described by D.C.

   c. A sofa, two chairs, and a box-type TV in the living room as described by D.C.

   d. In the bedroom was a bed with a crease in the center of the bed that goes horizontally as described by D.C. Also, a bed frame next to the bed with no mattress or box spring.

   e. A computer table with a desktop computer sitting on top as described by D.C.;

   f. A box-type TV (larger than the TV in the living room) as described by D.C.

   g. The sheets on the bed were reddish in color, also described by D.C.

   h. At least one rag containing stains consistent with bodily fluids was located inside the apartment, as described by D.C.

   i. The floor plan of the apartment was strikingly similar as described by D.C.

19.   I was present during the above search warrant execution and accompanied Detective Dewees to DELOSREYES' gray Nissan Sentra that was parked in front of DELOSREYES's residence. I observed Detective Dewees enter this vehicle and manually access the built-in GPS system, whereupon he conducted a brief manual search of this GPS system and located D.C.'s residential address stored as previous destination.

20.   The TARGET LOCATIONS were seized by the FPD from inside DELOSREYES's residence, with the exception of the abovementioned gray 2015 Nissan Sentra that was seized from the parking lot outside DELOSREYES's residence.

21.   On December 20, 2017, the TARGET LOCATIONS, with the exception of the abovementioned gray 2015 Nissan Sentra, were provided by the FPD to the FBI and stored at the FBI's Digital Analysis and Research Center pending forensic analysis.

22.   The gray 2015 Nissan Sentra remains in the control and custody of the FPD at the FPD Impound on Airport Drive in Frederick, Maryland.

23.   Based on my conversation with General Manager Kenny Booth from Herb Gordon Nissan dealership on January 17, 2018, the GPS navigation system in the 2015 Nissan Sentra has rudimentary capabilities that include downloading location information from the GPS satellite system and plotting it on a map that is stored in the GPS system. The GPS system has the capability to record and store address and waypoint information that is input by the user, but it does not have the capability to connect to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and locations where the user has traveled.

### CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO PRODUCE, RECEIVE AND/OR POSSESS

## **CHILD PORNOGRAPHY**

24.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography:

a.    Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.    Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines,

correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

      d.    Likewise, individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.

      e.    Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

      f.    Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if DELOSREYES uses a portable device such as a mobile cell phone to access the internet and child pornography, it is more likely than not that evidence of this access will be found in the TARGET LOCATIONS, as set forth in Attachment B.

USAO201300232

18 - 0 1 4 9 JMC    18 - 0 1 5 0 JMC

25. Based on the following, I believe that DELOSREYES likely displays characteristics common to individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography. For example:

    a. DELOSREYES was previously convicted of 2nd degree sexual abuse of an elementary school aged child;

    b. DELOSREYES reportedly committed sex acts with a minor, D.C.;

    c. DELOSREYES reportedly asked minor D.C. for pictures of his buttocks, and D.C. sent several pictures of himself, to include images of his buttocks and erect penis.

    d. DELOSREYES online chats with minor D.C. were characterized as being "sexual based."

## SUMMARY

26. Based on the investigation, the user of Planet Romeo account "Nomarloveyou" is Registered Child Sex Offender RAMON MANUEL DELOREYES who is alleged to have met and communicated with a 12-year old boy, D.C. via the internet website, Planet Romeo. DELOSREYES used this website to facilitate his travel to Frederick, Maryland, in order to pick up the child and take the child to his residence in Montgomery County to sexually assault the child. Additionally, DELOSREYES allegedly used the internet to solicit the receipt of, and/or production of, sexually explicit images of D.C.

27. Based on my training and experience, as well as the activity of DELOSREYES as detailed above, I believe that DELOSREYES displays characteristics common to individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography as discussed above. Since the aforementioned digital items appear to be accessed, controlled and/or possessed by DELOSREYES, I respectfully submit there is probable cause that the digital

USAO201300232

18 - 0 1 4 9 JMC        18 - 0 1 5 0 JMC

items seized pursuant to the execution of a search warrant at DELOSREYES's residence contain evidence: (1) of production, receipt, and possession of child pornography and coercion and enticement, and (2) are relevant to determine the ownership and control of the accounts that are linked to the production, receipt and possession of child pornography.

28. Based on my training and experience, as well as the activity of DELOSREYES as detailed above, I believe there is probable cause that evidence of coercion and enticement will be located within the automobile GPS navigation system of the Nissan Sentra described above, including historical address data regarding DELOSREYES' travel to and from D.C's residence in Frederick, Maryland.

## CONCLUSION

29. Based on the foregoing, I respectfully submit there is probable cause to believe the SUBJECT OFFENSES have been violated, and there is probable cause to believe evidence of these crimes can be found on the TARGET LOCATIONS.

30. FURTHER, I respectfully request that the Court issue a search warrant to search the TARGET LOCATIONS listed in Attachment A-1 and A-2 of this affidavit, to seize any items located pursuant to the search as described in Attachment B.

FILED ENTERED
LOGGED RECEIVED
FEB 02 2018
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

_____
Special Agent Jeffrey A. Yesensky
Federal Bureau of Investigation

Sworn and subscribed before me
this 19 day of January 2018

_____
HONORABLE J. MARK COULSON
UNITED STATES MAGISTRATE JUDGE